Smith, J.
(dissenting).The majority holds that when one parent illegally prevents the other parent from visiting their children, the efforts to effectuate visitation pursuant to a court order by the excluded parent may constitute “neglect.” Because the reasoning of the majority may not be sustained, we dissent.
This neglect proceeding was brought by the New York Monroe County Department of Social Services (MCDSS) for an order of protection to prevent the subject children from having to comply with a custody order issued by a court in Florida. Prior to the commencement of this matter, the father, a New York resident, had prevented his ex-wife from visiting and communicating with their children. His actions were in violation of court orders issued by a Florida court which had explicitly granted the mother such parental rights.
*320 The majority inconsistently holds that the mother had “a legal right to seek enforcement of valid court orders” but doing so would fall below a “minimum standard or degree of care” due to the “special vulnerabilities” of her children (majority opn, at 315). Seeming to ignore the fact that it was the father’s extralegal actions which forced the mother to turn to the courts in the first place, the majority holds that the mother did not have the legal right to exercise the legal rights she had. We disagree with the instant rationalization of the majority and conclude that the mother’s actions do not constitute child “neglect” occurring in this State to extend personal jurisdiction over her.
Moreover, the courts of Florida continue to exercise original jurisdiction over this matter in the best interests of the children. Under such circumstances, principles of comity and public policy virtually preclude a New York court from granting the relief sought by petitioner to modify an order of the Florida court in any event (see, Matter of Mott v Patricia Ann R., 91 NY2d 856 [decided today]). Accordingly, we dissent from the majority and would affirm the order of the Appellate Division.
While it is unnecessary to address all of the facts and allegations in this case as outlined by the majority, a few points should be noted for clarity. Following the tragic incident which culminated in the death of one daughter in September 1988, the father commenced a proceeding in Florida to modify the existing custody order encompassed by the original divorce decree. By order of the Florida court dated June 7, 1989, the father obtained custody of the surviving daughter and the son who moved to New York to live with their father. The mother was awarded liberal visitation rights and custodial periods in Florida which included summer and Christmas holiday vacations.[1]
Although the father was awarded custody and charged with oversight of the “extraordinary psychological needs of the children,” counseling for the daughter was discontinued in 1992 and for the son in 1993 upon the father’s “contention that it was no longer needed.” Then, without initiating further proceedings regarding custody of the children, the father simply prevented their mother from seeing them. In 1994, the father refused to send the children to Florida during the Christmas holidays despite a previous agreement to do so. *321 However, plans were made for the mother to spend the holidays with her children in New York. Thereafter, the father refused to allow the mother to speak with the children when she telephoned and threatened her with harassment charges if she or any of her family or friends tried to contact the children. When he refused to permit a Christmas visit in 1995, the mother arrived in New York to visit her children accompanied by a police officer and another man. However, the children refused to leave with their mother.
Seeing no alternative, the mother filed contempt motions in the Florida court against the father’s illegal efforts to block visitation. In each instance, the court found the father in willful contempt of previous court orders and ordered visitation and further counseling for all parties. The father took no steps to comply with any of these court orders. Nor did he bring any legal action in Florida seeking a modification of the mother’s visitation rights or appeal the contempt orders entered against him in Florida.[2]
Following the father’s third citation for willful contempt in Florida, the mother filed a petition to modify the custody order. The children were represented in the Florida proceeding by a Florida guardian ad litem who spoke with them and their psychologists in New York. The report of the Florida guardian ad litem recommended that it was “in the best interest of the children that they should remain in the primary care of their father.” Despite that recommendation, the Florida court ordered the mother to become the primary residential parent for the children subject to “frequent and liberal access with their father” commencing 72 hours after the end of the children’s last school day in New York, but not later than June 15, 1997.
The court noted that all of the psychological reports had recognized that the children’s relationship with their mother was an important element of the maturation and healing process. Moreover, the reports noted that the children’s feelings *322 toward their mother should be addressed, preferably in counseling. However, the court clearly believed that the counseling recommendations were unlikely to occur if the father retained custody. As the court stated:
“this Court has attempted to exhaustion to secure compliance by the father with efforts to resolve this case short of a change of custody. The Court concludes there is no evidence in the record demonstrating the father will cooperate with the guardian’s recommendations; whereas, the record is filled with evidence of the father’s outright refusal to cooperate in any way with the Court’s orders.”
The father continued his pattern of ignoring the Florida courts and never appealed the order. However, after the Florida order was issued, the children’s “current psychological status” was reevaluated by a counselor, in part, at the request of the father.[3] Supported by the new evaluation, the MCDSS filed the instant neglect proceeding. The petition alleged that if the children were returned to the custody of the mother, their emotional and physical well-being would be at risk.
Family Court dismissed the instant proceeding for want of jurisdiction and the Appellate Division affirmed. The majority finds that the order of the Appellate Division should be reversed. We dissent.
A
Long-Arm Jurisdiction Under the Family Court Act
This Court must find that the petitioner’s allegations of neglect occurred in this State to assert personal jurisdiction over the nonresident mother. It is only upon a loose and newly expanded interpretation of “neglect” that the majority is able to find such jurisdiction and entertain the instant proceeding. Furthermore, the majority’s heretofore unrealized finding of “purposeful activity” runs afoul of constitutional due process.
Prior to 1990, the Family Court Act contained no provision to allow service upon an out-of-State respondent parent in child abuse and neglect proceedings. The absence of such statutory authority compelled courts to dismiss such actions involv *323 ing nonresident parents (see, e.g., Matter of Commissioner of Social Servs. v Harry R., 145 Misc 2d 768). However, in 1990, section 1036 of the Family Court Act was amended to authorize out-of-State service of a summons in child protective proceedings in cases involving abuse or neglect. As stated by the bill’s sponsor, the amendment would permit a court in such proceedings “to send process without the State pursuant to the long arm jurisdiction provisions of the CPLR where the allegedly abused or neglected child resides within the state” (see, Senator Goodhue, letter to Honorable Evan Davis, June 14, 1990, Bill Jacket, L 1990, ch 268). A year later, in 1991, the statute was again amended to provide long-arm jurisdiction if the child either resides or is domiciled in New York and the subject abuse or neglect occurs in the State. The proponents of the amendment universally felt that the new requirement that the abuse or neglect occur in New York was constitutionally mandated.[4]
As currently stated in Family Court Act § 1036 (c):
“In cases involving either abuse or neglect, the court may send process without the state in the same manner and with the same effect as process sent within the state in the exercise of personal jurisdiction over any person subject to the jurisdiction of the court under section three hundred one or three hundred two of the civil practice law and rules, notwithstanding that such person is not a resident or domiciliary of the state, where the allegedly abused or neglected child resides or is domiciled within the state and the alleged abuse or neglect occurred within the state.”
Consistent with the requirements of due process, the jurisdictional standards under article 10 of the Family Court Act are not mere technicalities to be dispensed with because children are involved. Since the basis of the proceeding arises from the respondent’s in-State abuse or neglect of the child, personal jurisdiction under the Family Court Act is consistent *324 with the general long-arm provisions of the CPLR. The location of the children is not dispositive. It is also the perpetration of instances of neglect or abuse within New York which provides sufficient “minimum contacts” with this State by a nonresident to allow the assertion of personal jurisdiction over him or her.
B
Neglect Occurring in New York
Since it is undisputed that the children are domiciled in New York, the sole question before this Court concerns the locus requirement that the neglect occur in New York to assert personal jurisdiction over the mother.[5] The majority erroneously divides this inquiry into a two-step process. First, the majority finds that the mother’s efforts to gain custody of her children through the Florida court may constitute “neglect” due to her disregard for her children’s “special vulnerabilities.” Second, rather than examine whether such “neglect” occurred in New York to satisfy the long-arm jurisdictional requirements of the Family Court Act, the majority finds that jurisdiction may be obtained over the mother based upon two separate events: (1) the mother’s efforts to defend and enforce her court ordered rights of parental visitation in litigation brought against her in New York; and (2) the enlistment of a New York police officer to help enforce the same rights. Contrary to the reasoning of the majority, these events, taken individually or together, are insufficient evidence of neglect occurring in New York to justify the assertion of personal jurisdiction over the mother.
It should be noted that the instance where the mother was involved in litigation to defend her parental rights was not included in the petition — nor was it cited to Family Court during oral argument — as an allegation of neglect. In fact, the petition makes no reference at all to the mother’s efforts to defend or enforce her parental rights through the courts of Florida or New York.
The mother’s defensive litigation efforts in New York do not justify long-arm jurisdiction. Although the majority states that *325 the “[u]se of the New York courts is a traditional justification for the exercise of personal jurisdiction over a nonresident” (majority opn, at 319) such reasoning has heretofore only been applicable to the “initiation and prosecution” of New York claims (Kazlow & Kazlow v Goodman & Co., 92 Misc 2d 1084, 1085) and not in the context of defensive litigation efforts based upon an absence of jurisdictional elements. Notably, we have unanimously affirmed the dismissal of the prior action for lack of jurisdiction (Matter of Mott v Patricia Ann R., 91 NY2d 856, supra).
Most troubling is the majority’s conclusion that the mother’s efforts to defend her parental rights through the court system of New York qualifies as “neglect” occurring in this State. Apparently, the only option available to the mother was to sit back and do nothing in the prior proceeding. It is by defending her parental rights that she “neglected” her children which, in turn, provides the basis for a subsequent protective proceeding and sufficient minimum contacts to establish personal jurisdiction in that proceeding.
Contrary to the majority’s assertion, the record is barren of evidence that the mother ever “threaten [ed] the children with the ultimate sanction of forced immediate relocation to Florida in her sole custody.” (Majority opn, at 317.) Rather, it is the ruling of the Florida court requiring the children’s relocation to Florida which has caused the alleged “neglect” of the children as manifested by their apprehension of relocating. Moreover, under no reasoning may the mother be said to have disregarded counseling recommendations to the detriment of her children by defending rights in a New York proceeding which occurred prior to the issuance of such recommendations. The majority opines that a “responsible adult” would have ignored her visitation rights, allowed her ex-husband to impede her efforts at building a relationship with her children and, instead, would have taken a “gradual approach by initially seeking, short, supervised visits, coupled with family counseling for all of the principals” (majority opn, at 317). The majority seemingly forgets that each time the Florida court cited the father for contempt, the court ordered just such counseling and visitation which the father repeatedly disregarded. Simply, there is no support for the majority’s conclusion that the mother’s defensive litigation may constitute an act of neglect occurring in this State.
It is difficult to fathom how a mother’s efforts to legally protect her parental rights by going to court could ever consti *326 tute neglect. Rather, the mother’s legal and ordinarily permissible attempts to enforce court orders and defend her parental rights are the antithesis of “neglect” and clearly represent a “minimum degree of care.” The majority’s ruling means that every action involving children (e.g., divorce) may provide a basis for a subsequent protective proceeding solely because the litigation itself was an example of neglect. The majority understandably seeks to limit its holding to cases involving children with “special vulnerabilities” which might restrict parental behavior which would otherwise be “unquestionably” lawful (majority opn, at 316, 317). In such cases, the majority holds that a parent does not have the legal right to exercise the legal rights he or she has. Such reasoning is unsupportable here where the mother had no other legal recourse in the face of her ex-husband’s illegal actions.
The sole allegation of neglect contained in the petition which actually occurred in New York concerns the mother’s visit in December 1995. The mother was legally entitled to the visit and the fact that she was accompanied by a police officer due to her husband’s threats to have her arrested if she attempted to see her children does not constitute “purposeful activity” directed at this State. Indeed, as advocated by the majority, such a familial visit in the children’s primary home setting is precisely the type of “gradual course” that a “responsible” parent would have pursued to reestablish visitation — which had been extralegally impeded in the first instance. The record lacks any evidence that the mother disregarded her children’s well-being by attempting the visit or that she had any notice that the visit would harm her children. This single allegation is certainly insufficient to sustain the majority’s unprecedented ruling in derogation of constitutional due process.
C
This Court Should Not Exercise Jurisdiction Under Established Principles of Comity and Public Policy
Although the lack of personal jurisdiction is, by itself, a sufficient reason to dismiss this proceeding, there are several other compelling reasons why the majority’s ruling is untenable. The Parental Kidnaping Prevention Act (PKPA) “imposes a duty on the States to enforce a child custody determination entered by a court of a sister State if the determination is consistent with the provisions of the Act” (Thompson v Thompson, 484 US 174, 175-176). The PKPA is applicable to “custody *327 determinations” which are broadly defined as “a judgment, decree, or other order of a court providing for the custody or visitation of a child, and includes permanent and temporary orders, and initial orders and modifications” (28 USC § 1738A [b] [3]). Despite the unqualified language of the PKPA, the majority concludes that the provision does not apply to protective proceedings brought by the State.[6]
However, to the extent that they seek to review the Florida court’s custody determination, the courts of New York are without subject-matter jurisdiction to do so (see, Matter of Mott v Patricia Ann R., 91 NY2d 856, supra). The MCDSS filed this proceeding seeking to prevent the mother from enforcing the Florida custody order. It will certainly be difficult to grant any relief to petitioner without somehow modifying the Florida court’s custody determination or otherwise rendering it unenforceable. Under any rationalization, the MCDSS explicitly sought to modify an “order of a court providing for the custody or visitation of a child” (28 USC § 1738A [b] [3]) which falls directly within the purview of the PKPA. Indeed, in oral argument before this Court, counsel for MCDSS stated that it was seeking “an order to place the children in a safe and secure setting.” Not even the majority endorses the possibility that the lower court may issue an order awarding primary custody to the father upon remittal.
Notably, basic principles of comity are concerned with the welfare of children as well as the restraint of abuses to the judicial process (see, Martin v Martin, 45 NY2d 739, 741; see also, Domestic Relations Law § 75-b). The fact that “the children’s best interest must come first * * * does not mean that the courts of this State should disregard [a] prior Florida judgment and determine, as if writing on a clean slate, who would make a better parent” (Martin v Martin, supra, 45 NY2d, at 741). Here, the Florida court has shown a willingness to enforce its own orders and it seems unlikely that that court will simply allow the father to ignore its orders with impunity. *328 Pitting the courts of two jurisdictions against each other is at odds with the desire to decrease litigation that is allegedly already harming the children.
In this case, the father’s self-help efforts have thwarted the mother’s legal visitation rights. This is precisely the type of behavior that we have declined to sanction in the past (see, e.g., Matter of Berlin v Berlin, 21 NY2d 371, 377; Martin v Martin, supra, 45 NY2d, at 742 [“successive contradictory determinations by courts of sister States, even if with ‘jurisdiction’, are unseemly and intolerable in a Federal union”]). It should also be noted that the father obtained custody by commencing a proceeding in Florida to modify the original custody award encompassed by the divorce decree and there is nothing preventing the father from taking such steps now. Indeed, his failure to do so is wholly unexplained.
The psychological evaluation upon which petitioner primarily relies is dated subsequent to the trial court ruling in Florida. Indeed, the focus of the report is the emotional impact of the Florida order upon the children. Such evidence could be referred to the Florida court for a determination of whether a further custody modification would be in the best interests of the children. The Florida court is also better situated to impose any familial or parental counseling on the mother or even modify the terms of her visitation rights should it be found necessary.[7]
The precedent issued today jeopardizes the power of all parents — indeed, all nonresident litigants — to legally defend their rights against illegal obstacles erected by another parent or other party. Moreover, principles of logic, comity and public policy fully support the conclusion that the courts of New York *329 should properly refrain from adjudicating issues relating to the mother’s custody and visitation rights. This is not a case of which court should decide such issues; rather, the majority opens the door to the possibility that a New York court might issue purportedly binding orders that directly contradict orders of the Florida courts — all without any basis for the assertion of personal jurisdiction over a Florida resident.
We note that the majority’s ruling here cannot immunize or condone the father’s continual actions which have been contrary to the court orders issued by the Florida courts. It is his duty to appeal to the courts in Florida regarding his illegal actions. We further note that the father’s actions, and his potential civil or even criminal liability, are clearly not in the children’s best interests. All of these issues should be examined to determine the best course of action in the best interests of these children.
There is no question that the subject children have endured much tragedy which has left an indelible imprint upon their emotional psyches. However, it is also clear that the mother and father share an acrimonious relationship which may be affecting their children in none too subtle ways. Recently, the Florida Court of Appeal, First District, reversed the court order which prompted this proceeding “insofar as it directly orders the children to comply with that order as well as all previous orders of the court” (see, Tomaso v Rivazfar, 701 So 2d 407, 408 [Nov. 10, 1997]). The father never appealed the remaining portion of the Florida custody order. Clearly, the courts of Florida are eminently qualified to protect these children and that State, if given the chance, will take any and all steps necessary to do so in its continued vigilance in this matter.
Accordingly, we dissent from the majority’s ruling and conclude that the order of the Appellate Division should be affirmed.

. The children visited with their mother during the summer months and the Christmas holidays in 1990, 1991 and 1993.

. However, the children, by their guardian ad litem, filed a petition in New York which sought a temporary restraining order prohibiting them from being removed from this State and seeking to modify the Florida court’s order by deleting the provisions which provided for the mother’s visitation. We have affirmed the dismissal of that action for lack of jurisdiction (see, Matter of Mott v Patricia Ann R., 91 NY2d 856, supra). The majority has noted that the mother defended her rights in that action by relying on the Florida court orders and, at the same time, moving for dismissal based upon lack of jurisdiction.

. The majority states that the “mental health expert” who examined the children was “not affiliated with either parent” (majority opn, at 315). However, his report explicitly states that his evaluation was conducted partially at the request of the father.

. See, Meservey, Acting Exec Director of Council on Children & Families, Mem to Moore, Apr. 26, 1991, Bill Jacket, L 1991, ch 69 (“the changes assure there is sufficient nexus between the exercise of personal jurisdiction and the acts giving rise to personal jurisdiction to make the statute more easily defensible against a constitutional challenge”); Perales, Dept of Social Servs, Apr. 26, 1991, Bill Jacket, L 1991, ch 69 (“the bill will ensure a constitutionally sound basis for obtaining jurisdiction over out-of-State respondents in child protective proceedings”).

. As an initial matter, “neglect” only encompasses children under 18 years old. Since the daughter is now over 18, the mother’s actions may not be considered “neglect” and the instant proceeding should be dismissed as to her. Indeed, petitioner concedes that the daughter is no longer subject to custody orders issued in either New York or Florida since she is over 18 years old (see, Domestic Relations Law § 2; Fla Stat Annot § 743.07 [1], [3]).

. Arguably, the preemption sphere of the PKPA is not so limited. Rather, the statute should be interpreted without qualification since it is clear that “Congress’ chief aim in enacting the PKPA was to extend the requirements of the Full Faith and Credit Clause to custody determinations” (Thompson v Thompson, 484 US 174, 183, supra). As New York commentators have remarked, the PKPA “does not exclude child protective proceedings” (Sobie, 1997 Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 75-c, 1997-1998 Pocket Part, at 95-96; see also, Care & Protection of Vivian, 420 Mass 879, 652 NE2d 616; State in Interest of D.S.K, 792 P2d 118 [Utah]; Matter of R.L.S., 879 P2d 1258 [Okla]).

. Importantly, New York State policy favors retention of parent-child relationships and contacts when acting in the child’s best interests (Matter of Dickson v Lascaris, 53 NY2d 204, 208). It should also be noted that the mother has a vital interest in retaining visitation with her children (see, Santosky v Kramer, 455 US 745, 753 [“Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life”]). Moreover, we have noted that a child’s wishes may not be dispositive (see, Dintruff v McGreevy, 34 NY2d 887, 888; Matter of Lincoln v Lincoln, 24 NY2d 270, 273). As we further stated in Matter of Nehra v Uhlar (43 NY2d 242), “The desires of young children, capable of distortive manipulation by a bitter, or perhaps even well-meaning, parent, do not always reflect the long-term best interest of the children” (id., at 249; see also, Elkins v Vanden Bosch, 433 So 2d 1251, 1252 [Fla 3d Dist Ct App], review dismissed 438 So 2d 831 [Fla 1983]). Such cautions are particularly relevant here where the record demonstrates the father’s antipathy towards his ex-wife.